Michael T. Risher (CA SBN 191627)
mrisher@aclunc.org
Linda Lye (CA SBN 215584)
llye@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street, 2nd Floor
San Francisco, California 94111
Telephone:    415-621-2493
Facsimile:     415-255-8437

Attorneys for Plaintiffs
AMERICAN CIVIL LIBERTIES UNION OF
NORTHERN CALIFORNIA and
SAN FRANCISCO BAY GUARDIAN

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA; SAN FRANCISCO BAY GUARDIAN,<br><br>      Plaintiffs,<br><br>      v.<br><br>FEDERAL BUREAU OF INVESTIGATION,<br><br>                Defendant. | CASE No.: 12-cv-3728-SI<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT**<br><br><br>Hearing Date:  December 20, 2013<br>Time:              9:00 a.m.<br>Location:        Courtroom 10, 19th Floor<br>Judge:           Hon. Susan Illston |

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

TO DEFENDANT AND ITS COUNSEL OF RECORD:  PLEASE TAKE NOTICE THAT on December 20, 2013 at 9 am, or as soon thereafter as the parties may be heard, Plaintiffs American Civil Liberties Union of Northern California and San Francisco Bay Guardian will bring for hearing a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 in this Freedom of Information Act ("FOIA") action on the ground that Defendant is unlawfully withholding agency documents, in particular that the exemptions asserted by the agency as to the documents processed thus far are inapplicable.  The hearing will take place before the Honorable Susan Illston, in Courtroom 10, 19th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102. This motion is based on this notice, the attached memorandum of points and authorities, the accompanying Third Declaration of Linda Lye and attached exhibits, all pleadings and papers filed in this action, and such oral argument and evidence as may be presented at the hearing on the motion.

Dated:  October 25, 2013                    Respectfully submitted,


                                            By:  /s/ Linda Lye
                                                 Linda Lye

                                            Michael T. Risher
                                            Linda Lye
                                            AMERICAN CIVIL LIBERTIES UNION
                                            FOUNDATION OF NORTHERN
                                            CALIFORNIA
                                            39 Drumm Street
                                            San Francisco, CA 94111
                                            Tel:    (415) 621-2493
                                            Fax:    (415) 255-8437

                                            Attorneys for Plaintiffs

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND .................................. 2

    A.     The Occupy Movement ................................................................ 2

    B.     Plaintiffs' FOIA Requests ........................................................... 3

    C.     This Court's Prior Summary Judgment Order ............................. 3

    D.     The FBI's Revised Declaration .................................................... 4

    E.     Limitations On FBI Authority To Conduct General Investigations ........... 5

        1.     History of FBI Abuses ..................................................... 6

        2.     Limitations On FBI Investigations .................................. 6

        3.     The FBI Has A More Recent History Of Improperly
            Investigating First Amendment Activity ......................... 7

    F.     The FBI's Overcollection Of Information Through Suspicious
        Activity Reports ............................................................................ 8

        1.     The criteria for assessing whether activities have a
            potential nexus to terrorism ........................................... 13

        2.     Suspicious Activity Reports Encompass Non-Criminal
            Behavior .......................................................................... 10

III.   ARGUMENT ......................................................................................... 11

    A.     Legal Framework ....................................................................... 12

    B.     The FBI Cannot Rely On Exemption 7 Because It Has Not
        Established A Legitimate Law Enforcement Objective ............... 12

    C.     The FBI Has Not Met Its Burden Of Establishing The
        Remaining Elements Of The Law Enforcement Exemption ..... 17

        1.     Exemption 7(A) For Pending Law Enforcement
            Proceedings .................................................................... 17

        2.     Exemption 6 and 7(C) For Personal Privacy ................. 18

        3.     Exemption 7(D) For Confidential Sources ..................... 20

        4.     Exemption 7(E) For Investigative Techniques ............... 21

    D.     The FBI's Submission Of An *In Camera* Declaration Deprives
        Plaintiffs Of A Meaningful Opportunity To Contest The
        National Security Exemption ...................................................... 23

IV.    CONCLUSION ..................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**                                                                                      **Page(s)**

3

*Bay Area Lawyers Alliance v. Dep't of State,*
4
    818 F. Supp. 1291 (N.D. Cal. 1992) ...................................................................23

5

*Billington v. United States Dep't of Justice,*
6
    233 F.3d 581 (D.C. Cir. 2000) ......................................................................20

7

*Branch v. FBI,*
    658 F. Supp. 204 (D.D.C. 1987) ....................................................................18

8

*Campbell v. United States Dep't of Justice,*
9
    164 F.3d 20 (D.C. Cir. 1998) .......................................................12, 17, 20

10

*Church of Scientology of Cal. v. U.S. Dep't of Army,*
11
    611 F.2d 738 (9th Cir. 1979) ........................................................................15

*CIA v. Sims,*
12
    471 U.S. 159 (1985) ....................................................................................12

13

*Department of the Air Force v. Rose,*
14
    425 U.S. 352 (1976) .............................................................................12, 17

15

*Elec. Frontier Found. v. Dep't of Defense,*
    2012 WL 4364532 (N.D. Cal. Sept. 24, 2012) .................................................22
16

*Favish v. Office of Indep. Counsel,*
17
    217 F.3d 1168 (9th Cir. 2000) ......................................................................12

18

*Feshbach v. SEC,*
19
    5 F. Supp. 2d 774 (N.D. Cal. 1997) ...............................................................22

20

*Gordon v. FBI,*
21
    390 F. Supp. 2d 897 (N.D. Cal. 2004) .......................................................12, 20

22

*Lawyers' Comm. for Civil Rights of San Francisco Bay Area v. Dep't of Treasury,*
    2008 WL 4482855 (N.D. Cal. Sept. 30, 2008) .................................................18
23

*Lissner v. United States Customs Serv.,*
24
    241 F.3d 1220 (9th Cir. 2001) ................................................................19, 20

25

*Powell v. United States Dep't of Justice,*
26
    584 F. Supp. 1508 (N.D. Cal. 1984) ..............................................................16

27

*Quiñon v. FBI,*
    86 F.3d 1222 (D.C. Cir. 1996) ............................................................13, 14, 15, 21
28

*Richardson v. United States,*
     841 F.2d 993 (9th Cir. 1988) ..................................................................................13, 22

*Rosenfeld v. United States Dep't of Justice,*
     2008 WL 3925633 (N.D. Cal. Aug. 22, 2008) ......................................................................11

*Rosenfeld v. United States Dep't of Justice,*
     2010 WL 3448517 (N.D. Cal. Sept. 1, 2010) ......................................................................11

*Rosenfeld v. United States Dep't of Justice,*
     57 F.3d 803 (9th Cir. 1995) ......................................................................... *passim*

*Rosenfeld v. United States Dep't of Justice,*
     761 F. Supp. 1440 (N.D. Cal. 1991) ..................................................................................24

*United States Dep't of Justice v. Landano,*
     508 U.S. 165 (1993)..........................................................................................20, 21

*Wiener v. FBI,*
     943 F.2d 972 (9th Cir. 1991) ......................................................................... *passim*

**Statutes**

5 U.S.C. § 552 ......................................................................................................... *passim*

6 U.S.C. § 485 ..........................................................................................................9

18 U.S.C. § 231 ..................................................................................................13, 14

18 U.S.C. § 2101 ................................................................................................13, 14

18 U.S.C. § 2331 ..................................................................................................14

18 U.S.C. § 2385 ..................................................................................................14

28 U.S.C. § 533..................................................................................................4, 5

28 U.S.C. § 534..................................................................................................4, 5

50 U.S.C. § 1801..................................................................................................6

Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458,
     118 Stat. 3638 ......................................................................................................5, 9

**Rules**

Fed. R. Evid. 1002 ..................................................................................................24

**Regulations**

28 CFR § 0.85(a)............................................................................................6

28 CFR § 23.20(a)........................................................................................16

**Congressional Materials**

S. Select Comm. to Study Governmental Operations with Respect to Intelligence
    Activities and the Rights of Americans (Book II), S. Rep. No. 94-755 (1976)....................6

**Executive Materials**

2 U.S. Op. O.L.C. 47, 1978 WL 15263 (1978)......................................................6, 15

Exec. Order No. 13356 § 1(a), 69 Fed. Reg. 53599 (Aug. 27, 2004)...........................9

Information Sharing Environment, *Functional Standard: Suspicious Activity
    Reporting (SAR), Version 1.5* 6 (May 21, 2009)..................................9, 10, 16, 22

Office of the Inspector General, The Federal Bureau of Investigation's Compliance
    with the Attorney General's Investigative Guidelines, *Chapter Two: Historical
    Background of the Attorney General's Investigative Guidelines* § III (Sept. 2005) ..........6, 7

**Media Articles**

Associated Press, *ACLU releases files showing innocent Americans caught up in
    surveillance*, The Guardian (Sept. 19, 2013) .........................................................10

Bob Egelko, *FBI reports show widespread domestic surveillance*, San Francisco
    Chronicle (Sept. 20, 2013) ............................................................................10, 11

Paul Elias, *ACLU: Papers Show Domestic Spying Goes Too Far*, Huffington Post
    (Sept. 19, 2013)...........................................................................................10

Paul Elias, *ACLU: Papers Show Domestic Spying Goes Too Far*, Huffington Post
    (Sept. 19, 2013)...........................................................................................10

Daniel Zwerdling, G.W. Schulz, Andrew Becker & Margot Williams, *Mall
    Counterterrorism Files ID Mostly Minorities*, Nat'l Pub. Radio, Sept. 8, 2011 .................10

# I.   INTRODUCTION

Plaintiffs in this FOIA matter seek information about the FBI's surveillance of "Occupy," the nationwide movement that fundamentally shifted the public debate on economic inequality. The purpose of this request is to determine whether the FBI surveilled constitutionally protected political protests.  The FBI refuses to produce documents that would shed light on this issue. The Court previously ruled in Plaintiffs' favor, finding the FBI's justifications insufficient.  It should do so again now.

The key question before the Court is whether the FBI in compiling information about the Occupy movement acted in furtherance of a legitimate law enforcement purpose.  It did not. The FBI primarily seeks to withhold documents under FOIA's Exemption 7, for "law enforcement records."  To do so, it must as a threshold matter show that the records were compiled for an authorized law enforcement purpose.  Because the FBI exceeded its law enforcement mandate, it cannot shield these records from public scrutiny.

*First*, the FBI contends that it compiled these records in furtherance of its "general investigative authority" to help state and local law enforcement agencies investigate unspecified, potential crimes.  But the FBI lacks authority to investigate state and local crimes.  In any event, the agency must specify the specific laws it was seeking to enforce and the facts that warrant an investigation.  If the agency had a legitimate law enforcement purpose at the time it compiled these records, it should have no difficulty identifying the violations it was investigating and the factual predicate for its conduct.  Yet even three declarations later, the FBI is still unable or unwilling to provide that information and has thus failed to meet its burden.

*Second*, the FBI invokes its authority to collect and share counter-terrorism information, explaining that it has developed a system for exchanging so-called "Suspicious Activity Reports" between federal, state, and local law enforcement agencies across the country.  But as explained below, the federal government has cast an extremely wide net when it comes to suspicious activity reporting, expressly defining all manner of entirely lawful, and in some cases constitutionally protected activity, as so suspicious that it should be monitored, analyzed,

and recorded in government databases.  In the name of collecting counter-terrorism information, the federal government is monitoring everything from the mundane – like buying pallets of water – to the constitutionally protected – like photographing bridges, dams, and courthouses.  Suspicious Activity Reports have become an invitation to engage in exactly the sort of "generalized monitoring and information-gathering" that the Ninth Circuit has found *not* to constitute a legitimate law enforcement purpose within the meaning of Exemption 7. *Rosenfeld v. United States Dep't of Justice*, 57 F.3d 803, 809 (9th Cir. 1995).  For these and other reasons, the Court should order the documents disclosed.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Occupy Movement

September 17, 2011 gave birth to the Occupy Movement, with an inaugural protest on Wall Street in New York.  Occupy Wall Street, a protest against social and economic inequality, spawned protests across the country, including several in Northern California.  As the *New York Times* succinctly summarized, Occupy "succeeded in implanting 'we are the 99 percent' into the cultural and political lexicon."  *See* First Lye Decl. (ECF No. 24) at ¶ 2 & Exh. A.

Unfortunately, the brutality of law enforcement's crackdown on some Occupy protests soon overshadowed the demonstrators' message.  The Oakland Police Department's ("OPD") handling of Occupy Oakland gained particular notoriety, when OPD blanketed crowds of protesters with tear gas and exploding projectiles, on October 25 and November 2, 2011.  The media extensively covered the protests, including the names of those injured by law enforcement – for example, Iraq war veteran Scott Olsen who suffered a severe head injury after being hit with a projectile, and former Army Ranger Kayvan Sabeghi, who suffered a ruptured spleen after a brutal beating that was caught on video.  *See id.* at ¶ 3 & Exh. B.  Further heavy-handed police responses to Occupy ensued at the University of California ("UC") at Berkeley on November 9, 2011, and at UC Davis on November 18, 2011.  *See id.* at ¶ 4 & Exh. C.  Cities across the country in an apparently coordinated effort evicted Occupy encampments almost simultaneously in November 2011.  *See id.* at ¶ 5 & Exh. D.

From the start, the FBI was monitoring Occupy.  The agency issued an unclassified Intelligence Bulletin three days before the inaugural Occupy Wall Street protest on September 17, 2011 and the media also reported on the FBI investigation of and receipt of intelligence about various Occupy movements.  *See id.* at ¶¶ 6-7 & Exhs. E & F.  Plaintiffs submitted their FOIA request to find out more about the FBI's monitoring of the movement.

### B.     Plaintiffs' FOIA Requests

On March 8, 2012, Plaintiffs American Civil Liberties Union of Northern California ("ACLU-NC") and the *San Francisco Bay Guardian* submitted a FOIA request to the FBI seeking records about its surveillance of Occupy.  The request seeks:

1)     Records created, received, gathered or maintained by the FBI (including but not limited to sub-entities within the FBI such as the Joint Terrorism Task Force, the Campus Liaison Initiative, and the Academic Alliance Program) since June 1, 2011 pertaining to persons, planning, assemblies, marches, demonstrations, or any other activity associated with protest movements referring to themselves as Occupy Oakland, Occupy San Francisco, Occupy Cal, or Occupy UC Davis.

2)     Intelligence Bulletins referring to the "Occupy" movement generally or any geographically specific Occupy movement.

3)     Training for FBI agents regarding the Occupy movement generally or any geographically specific Occupy movement.

4)     Written materials related or referring to the Occupy movement generally or any geographically specific Occupy movement, and setting forth or referring to legal reasoning or authority relied upon by the FBI with respect to its investigatory and enforcement activities.

*See id.* at ¶¶ 8-9 & Exh. G.  Plaintiffs filed suit on July 17, 2012.  *See id.* ¶ 13.  Approximately one month later, the FBI released 13 pages (some with redactions).  *See* Hardy Decl. (Doc. 22-1) (hereinafter "First Hardy Decl.") at ¶ 12 & Exh. E.  The FBI has withheld in full nine documents and withheld in part two documents.  *See id.* at Exh. H (*Vaughn* Index).  It claims that two exemptions from FOIA's disclosure requirements justify this:  national security (Exemption 1) and various law enforcement exemptions (Exemption 7).  *See* First Hardy Decl. at Exh. H.

### C.     This Court's Prior Summary Judgment Order

The parties previously cross-moved for summary judgment.  The Court denied the FBI's

motion and granted in part, denied in part Plaintiffs' cross-motion.  *See* Order (ECF No. 32).

The Court held that the FBI had failed to demonstrate it had conducted a reasonably adequate

search for responsive materials.  *See id.* at 5, 7.  The Court also found the FBI's declarations

insufficient to justify any exemptions invoked.  *See id.* at 9-16.

The Court first found that the FBI failed to explain how revealing its intelligence source

method or a particular source would harm national security.  *See id.* at 9.

With respect to the law enforcement exemption, the Court held as a threshold matter

"that the FBI has not established a law enforcement objective to allow withholding any

documents under Exemption 7."  *See id.* at 10-11.  The FBI had initially "assert[ed] that its law

enforcement objective is 'provid[ing] support to state and local law enforcement agencies

regarding the "Occupy" movements across the country.'"  *Id.* at 10 (quoting First Hardy Decl. ¶

52)).  The FBI then submitted a second declaration stating that "its law enforcement basis is

also under '[t]he FBI's general investigative authority in 28 U.S.C. § 533 and its general

authority to collect records in 28 U.S.C. § 534,' and it was investigating 'crimes and terrorism

related to the enforcement of federal laws.'"  *Id.* (quoting Supplemental Hardy Decl. (ECF No.

26-1) (hereinafter "Second Hardy Decl.") ¶ 15).  The Court held that the agency had failed to

establish a rational nexus to a law enforcement mandate because the FBI "refers only vaguely to

'crimes' and 'federal laws,' but does not cite the specific laws that it was enforcing."  *Id.*

Although the Court held that the FBI had not satisfied the threshold requirement for

invoking any documents under Exemption 7, the Court also addressed the subsidiary Exemption

7 issues and found the FBI not to have met its burden as to each.  *See id.* at 11-16.

The Court ordered the FBI to submit a revised declaration addressing the adequacy of

the search and the basis for withholding documents.  *See id.* at 7, 16.

### D.     The FBI's Revised Declaration

The FBI has now submitted two additional declarations.  Mr. Hardy has submitted a

declaration *in camera* and *ex parte*, addressing the national security claim.  *See* Notice of

Lodging of *In Camera*, *Ex Parte* Declaration (ECF No. 35) (hereinafter "Notice of Lodging").

Mr. Hardy has also submitted a third public declaration addressing the adequacy of the search and the Exemption 7 issues. The FBI states that there are "dual law enforcement purposes for the compilation of the responsive records in this case," in particular, "'the FBI's general investigative authority' per 28 U.S.C. §§ 533 and 534 and the FBI's assigned 'lead role in investigating terrorism and in the collection of terrorism threat information.'" Third Hardy Decl. (ECF No. 34-1) ¶ 11.

With respect to the first purpose, Mr. Hardy states that "the investigative records at issue in this case … concern documents compiled as a result of assistance the FBI rendered to various state and local law enforcement agencies which were investigating potential criminal activity by" Occupy protesters. *Id.* ¶ 12.

Amplifying the second purpose, Mr. Hardy explains that the records are part of the so-called Suspicious Activity Reporting program. He states that "the records were … compiled as part of the FBI's core counter terrorism function via the national eGuardian terrorist threat reporting and assessment system." *Id.* ¶ 13. "The eGuardian system is a[n]… information sharing platform … [that] allows law enforcement agencies to combine new suspicious activity reports ('SARs') along with existing SAR reporting systems to form a single information repository accessible to thousands of law enforcement personnel." *Id.* ¶ 14. "[S]uspicious activity reporting" is "one of the key information exchanges between the federal government and state, local, and tribal law enforcement partners," and grows out of "the Intelligence Reform and Terrorism Prevention Act," which "requires the President to establish an information sharing environment for sharing terrorism information…." *Id.* ¶ 15.

To shed light on these asserted dual law enforcement purposes, Plaintiffs provide additional background on the FBI's authority to conduct "general investigations" and the collection of Suspicious Activity Reports.

### E.    Limitations On FBI Authority To Conduct General Investigations

The FBI has an unfortunately checkered history involving surveillance of First Amendment activity. For important constitutional and historical reasons, the FBI therefore does

not have authority to conduct investigations of state and local crimes.

### 1.    History of FBI Abuses

In the 1970s, a Senate Select Committee, more commonly referred to as the "Church Committee," after its Chair, Senator Frank Church, held a series of hearings to investigate abuses by the FBI.[1]  The Church Committee found that the FBI had opened 65,000 domestic intelligence files in one year alone, collecting "vast amounts of information about the intimate details of citizens' lives and about their participation in legal and peaceful political activities"; "targets of intelligence activity have included … proponents of racial causes and women's rights [and] outspoken apostles of nonviolence and racial harmony…."[2]

These revelations led to reforms, including the Foreign Intelligence Surveillance Act, which was originally intended to regulate government surveillance for national security purposes and protect privacy.  *See* 50 U.S.C. § 1801 *et. seq.*  In addition, the Attorney General has adopted "Attorney General Guidelines" governing FBI domestic operations as "part of a broader effort to reform the FBI's investigative and intelligence operations in light of the findings of the Church Committee."[3]

### 2.    Limitations On FBI Investigations

Given this history of overreach, there are important restrictions on the FBI's authority to undertake investigations.

First, the FBI has investigative jurisdiction only over violations of federal laws.  *See* 28 CFR § 0.85(a).  "[T]he FBI has no Federal authority to take action with respect to violations of State law."  2 U.S. Op. O.L.C. 47, 47, 1978 WL 15263 (1978).

---

[1] *See, e.g.*, S. Select Comm. to Study Governmental Operations with Respect to Intelligence Activities and the Rights of Americans (Book II), S. Rep. No. 94-755 (1976).
[2] *Id.* at 6-7.
[3] *See* Office of the Inspector General, The Federal Bureau of Investigation's Compliance with the Attorney General's Investigative Guidelines, *Chapter Two: Historical Background of the Attorney General's Investigative Guidelines* § III (Sept. 2005), *available at* http://www.justice.gov/oig/special/0509/chapter2.htm, attached as Third Lye Decl. at Exh. 1.

Second, its own policies require certain predicates to be satisfied and documented before opening any kind of investigation.[4]

Third, its own policies also recognize that it has authority to provide investigative assistance to state or law agencies only in enumerated circumstances, such as "the investigation of matters that may involve federal crimes or threats to the national security."[5]

### 3.    The FBI Has A More Recent History Of Improperly Investigating First Amendment Activity

Unfortunately, these safeguards have not been sufficient to prevent the agency from targeting First Amendment activity.  FBI documents obtained through FOIA requests in the 2000s suggested that the agency was targeting domestic groups for investigation based on their First Amendment activity; media reports and congressional inquiries followed.  *See* Office of the Inspector General, Dep't of Justice, A Review of the FBI's Investigations of Certain Domestic Advocacy Groups at 1 (2010) (hereinafter "IG Report"), excerpts attached as Third Lye Decl. at Exh. 4.  The Inspector General ("IG") of the Department of Justice conducted a review in response.  *Id.*

***Inadequate Predication***.  The IG found that "in several cases, the FBI's predication was factually weak and in several cases there was little indication of any possible federal crime as opposed to local crime."  *Id.* at 186.[6]  The IG also found the lack of proper documentation of the

---

[4] The FBI's internal policy manual, known as the Domestic Investigations Operations Guide ("DIOG"), sets forth various types of investigations, ranging from an "Assessment" (of which there are five types) to a "Preliminary Investigation," to a "Full Investigation."  *See generally* DIOG at Table of Contents § 18.  There are standards for opening an assessment, *id.* at § 5.5; and they must be documented when any assessment is opened.  *See id.* at § 5.6.3.1.2; § 5.6.3.1.3; § 5.6.3.2.2; § 5.6.3.2.3; § 5.6.3.3.2; § 5.6.3.3.3; § 5.6.3.4.4.  Similarly, internal policies set forth standards that must be met to open Preliminary and Full Investigations, as well as attendant documentation requirements.  *See id.* at § 6.6; § 6.7.1; § 7.6; § 7.7.1.  Excerpts of the DIOG cited in this brief are attached as Third Lye Decl. at Exh. 3.

[5] Attorney General's Guidelines For FBI Domestic Operations 27 (2008), attached as Third Lye Decl. at Exh. 2.

[6] The report also found that certain matters that should have been opened as only preliminary inquiries were instead opened as "full investigations," a distinction of significance "because the Attorney General's Guidelines limit the investigative techniques that can be used during

---

predication for opening investigations, as a result of which "FBI agents and supervisors sometimes provided the OIG with speculative, after-the-fact rationalizations for their prior decisions to open investigations that we did not find persuasive." *Id.* at 187.

***Improper collection and retention of information***.  The IG "also found instances in which the FBI used questionable investigative techniques and improperly collected and retained First Amendment information in FBI files." *Id.*  In one instance, "a probationary agent was sent to look for terrorism subjects at an anti-war rally in an ill-conceived project on a slow work day that resulted in the placement of inappropriate information in FBI files, in violation of the Attorney General's Guidelines." *Id.*

***Classification of trespassing and vandalism as "terrorism."***  Finally, the IG observed that all the matters it had reviewed had been classified by the FBI "as domestic terrorism cases." *See id.* at 188.  "[T]his practice relied upon potential crimes that may not commonly be considered as 'terrorism' (such as trespassing or vandalism) and that could alternatively have been classified differently." *Id.*  The terrorism designation adversely affected the persons investigated, not only by creating "stigma," but also by giving rise to other harms such as potential placement on watchlists. *Id.*

## F.   The FBI's Overcollection Of Information Through Suspicious Activity Reports

After 9/11, the federal government has prioritized sharing terrorism-related information across local, state, and federal agencies.  The result has been the proliferation of so-called Suspicious Activity Reporting.  The federal government launched a Nationwide Suspicious Activity Reporting Initiative to establish a "nationwide capability to gather and share Suspicious Activity Reports (SAR) that have a potential nexus to terrorism."[7]  The stated purpose is to

---

preliminary inquiries and require more frequent review to determine if the investigation should be closed." *Id.* at 186-87.

[7] *See* United States Government Accountability Office, *Information Sharing: Additional Actions Could Help Ensure That Efforts to share Terrorism-Related Suspicious Activity Reports Are Effective* 1 (Mar. 2013) (hereinafter "GAO Report").  Excerpts of the GAO Report are attached as Third Lye Decl. at Exh. 5.

---

"facilitate the identification and mitigation of potential terrorist threats as well as analysis to determine whether there are emerging patterns or trends suggesting such threats."[8]

Suspicious Activity Reporting is notable in two regards.  First, the government's criteria for determining whether activity has a potential nexus to terrorism and should be submitted to federal counter-terrorism databases are publicly available.  Second, the criteria are extremely broad and include entirely non-criminal activity.  This has resulted in the reporting of constitutionally protected activity, such as photography, and racial and religious profiling.

### 1.    The criteria for assessing whether activities have a potential nexus to terrorism

The Information Sharing Environment ("ISE")[9] has published "Functional Standards" to establish common standards for the reporting of so-called "suspicious activities."[10]  The Functional Standards delineate 16 specific categories of behavior that are deemed to have a potential nexus to terrorism and accordingly are to be reported as "suspicious activities":  The categories range from "[c]yber [a]ttack[s]," to non-criminal activity, such as "[p]hotography" and "[q]uestioning individuals beyond a mere level of curiosity."[11]  A detailed account of the process by which Suspicious Activity Reports are gathered and processed, analyzed, and

---

[8] *Id.*

[9] The ISE was created by the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638.  This Act affirmed the key principles of an earlier adopted Executive Order 13356, which had directed agencies to give the "highest priority" to the "interchange of terrorism information among agencies" and "between agencies and appropriate authorities of States and local governments."  Exec. Order No. 13356 § 1(a), 69 Fed. Reg. 53599 (Aug. 27, 2004).  The ISE Program Manager is "responsible for information sharing across the Federal Government" and the issuance of "governmentwide procedures, guidelines, instructions, and functional standards" for information sharing.  6 U.S.C. § 485(f)(2)(A)(iii).

[10] *See* Information Sharing Environment, *Functional Standard: Suspicious Activity Reporting (SAR), Version 1.5* 6 (May 21, 2009) (hereinafter "Functional Standards") ("Standardized and consistent sharing of suspicious activity information regarding criminal activity among State and major urban area fusion centers and Federal  agencies is vital to assessing, deterring, preventing, or prosecuting those involved in criminal activities associated with terrorism.").  The Functional Standards are attached as Third Lye Decl. at Exh. 6.

[11] *Id.* at 29.

disseminated is set forth in documents published by the ISE.[12]

The ISE Functional Standards "appl[y] to all departments or agencies that possess or use terrorism or homeland security information…."[13]

### 2.      Suspicious Activity Reports Encompass Non-Criminal Behavior

As noted above, the Functional Standards include numerous types of behavior – such as photography – that are entirely non-criminal.[14]

In 2011, National Public Radio and the Center for Investigative Reporting obtained and reviewed more than 1,000 Suspicious Activity Reports involving incidents at the Mall of America near Minneapolis, and found that "almost two-thirds of the 'suspicious' people whom the Mall reported to local police were minorities," even though "whites account for 85 percent of the population in Minnesota."[15]

More recently, 1,800 Suspicious Activity Reports obtained by the ACLU showed that individuals engaged in entirely innocent activity are routinely written up in reports that are submitted to fusion centers and then passed along to the FBI's eGuardian system.[16]  For example, the following reports – none of which reference any criminal activity – were all

---

[12] *See* Functional Standards at 8-11.

[13] *See* Functional Standards at 1.

[14] Functional Standards at 29.

[15] Daniel Zwerdling, G.W. Schulz, Andrew Becker & Margot Williams, *Mall Counterterrorism Files ID Mostly Minorities*, Nat'l Pub. Radio, Sept. 8, 2011, available at http://www.npr.org/2011/09/08/140262005/mall-counterterrorism-files-id-mostly-minorities and attached as Third Lye Decl. at Exh. 7.

[16] *See, e.g.*, Associated Press, *ACLU releases files showing innocent Americans caught up in surveillance*, The Guardian (Sept. 19, 2013), *available at* http://www.theguardian.com/world/2013/sep/19/ordinary-americans-spying-fusion-center-program-aclu; Bob Egelko, *FBI reports show widespread domestic surveillance*, San Francisco Chronicle (Sept. 20, 2013), *available at* http://www.sfgate.com/nation/article/FBI-reports-show-widespread-domestic-surveillance-4828272.php; Paul Elias, *ACLU: Papers Show Domestic Spying Goes Too Far*, Huffington Post (Sept. 19, 2013), *available at* http://www.huffingtonpost.com/2013/09/19/aclu-spying_n_3956596.html; Martin Kaste, *ACLU Posts Fed-Collected 'Suspicious' Activity Reports Online*, Nat'l Pub. Radio (Sept. 19, 2013), *available at* http://www.npr.org/2013/09/19/223721407/aclu-posts-suspicious-activity-reports-online.  These news articles are attached as Third Lye Decl. at Exh. 8.

---

submitted to the FBI's eGuardian system:

- "Suspicious ME [Middle Eastern] Males Buy Several Large Pallets of Water"

- A sergeant from the Elk Grove Police Department reported "on a suspicious individual in his neighborhood"; the sergeant had "long been concerned about … a Middle Eastern male adult physician who is very unfriendly"

- "Female Subject taking photos of Folsom Post Office"

- "an identified subject was reported to be taking photographs of a bridge crossing the American River Bike trail"

- "two middle eastern looking males taking photographs of Folsom Dam. One of the ME males appeared to be in his 50's"

- "Suspicious photography of the Federal Courthouse in Sacramento":  an "AUSA [Assistant United States Attorney] reported to the Court Security Officer (CSO) a suspicious vehicle occupied by what [name blacked out] described as two Middle Eastern males, the passenger being between 40-50 years of age."

- "Suspicious photography of Folsom Dam by Chinese Nationals": "a Sac County Sheriff's Deputy contacted 3 adult Asian males who were taking photos of Folsom Dam. They were evasive when the deputy asked them for identification and said their passports were in their vehicle."

*See* Third Lye Decl. at ¶ 10 & Exh. 9.  Individuals who are the subject of a Suspicious Activity Report face FBI investigation.  Photographers, in particular, are a frequent focus of Suspicious Activity Reports.  *See* Third Lye Decl. at Exh. 10.  Security guards questioned one freelance photographer, who was on assignment photographing a refinery; two weeks later, two FBI agents showed up at his apartment to question him about the incident.[17]

## III.   ARGUMENT

The FBI has still failed to meet its burden of justifying the withholdings.[18]

---

[17] *See* Bob Egelko, *FBI reports show widespread domestic surveillance*, *supra* note 16.
[18] Mr. Hardy's revised declaration addresses the agency's search. Third Hardy Decl. ¶¶ 5-6. Although Plaintiffs do not agree that this declaration satisfies the requirements articulated in *Rosenfeld v. United States Dep't of Justice*, 2010 WL 3448517 (N.D. Cal. Sept. 1, 2010) and *Rosenfeld v. United States Dep't of Justice*, 2008 WL 3925633 (N.D. Cal. Aug. 22, 2008), Plaintiffs no longer contest the adequacy of the search.  In addition, Plaintiffs do not contest any exemptions asserted in the documents originating with the Coast Guard and from which Defendant removed various redactions following the Court's summary judgment order.  *See* Notice to Court (ECF No. 33).  The only issues now before the Court are whether the FBI may withhold in full or in part the documents in the *Vaughn* index.  *See* First Hardy Decl. at Exh. H.

### A.     Legal Framework

"The mandate of the FOIA calls for broad disclosure of Government records."  *CIA v. Sims*, 471 U.S. 159, 166 (1985).  The agency "shall make available to the public" the requested records, 5 U.S.C. § 552(a)(3), unless one or more of FOIA's nine statutory exemptions from disclosure applies.  *See* 5 U.S.C. § 552(b).

Because "disclosure, not secrecy, is the dominant objective of the Act," FOIA's exemptions "must be narrowly construed."  *Department of the Air Force v. Rose*, 425 U.S. 352, 361 (1976).  In addition, the government "has the burden of proving the applicability of any FOIA exemption claimed."  *Favish v. Office of Indep. Counsel*, 217 F.3d 1168, 1175 (9th Cir. 2000) (citation omitted).  The agency cannot rely on unsupported assertions that disclosure will or may result in a particular consequence, and must instead provide sufficient information "to afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding."  *Wiener v. FBI*, 943 F.2d 972, 977 (9th Cir. 1991) (internal quotation marks, citation omitted).

### B.     The FBI Cannot Rely On Exemption 7 Because It Has Not Established A Legitimate Law Enforcement Objective

Exemption 7 only applies to records that were "compiled for law enforcement purposes" and that also satisfy one or more of six additional criteria.  *See* 5 U.S.C. § 552(b)(7)(A)-(F).

To invoke this Exemption, agencies with a "clear law enforcement mandate" must as a threshold matter "establish a rational nexus between enforcement of a federal law and the document for which [a law enforcement] exemption is claimed."  *Rosenfeld*, 57 F.3d at 808 (internal quotation marks, citation omitted).   The "court's 'deferential' standard of review is not, however, 'vacuous.'"  *Campbell v. United States Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998).  "The burden is on the government to show that the information … was received for a law enforcement purpose; the burden is not on the plaintiffs to show that it was not."  *Gordon v. FBI*, 390 F. Supp. 2d 897, 901 (N.D. Cal. 2004)  The FBI asserts two objectives in claiming this Exemption:  its general investigative authority and its collection of counter-terrorism

information.  Neither suffices to meet the FBI's burden.

*General Investigative Authority.*  The FBI's reliance on its "general investigative authority" is both legally and factually inadequate.  Third Hardy Decl. ¶ 12.

Even under the deferential "rational nexus" standard, an agency must still identify the specific law, violation of which it is investigating, as well as the factual predicate justifying the investigation.  Thus, in *Wiener*, the Ninth Circuit found that the FBI had failed to establish a rational nexus for records pertaining to its investigation of John Lennon, where the agency stated that it was investigating "possible violations of the Civil Obedience Act of 1968, 18 U.S.C. § 231 (1988), and the Anti-Riot Act, 18 U.S.C. § 2101 (1988), because of his association with a radical group known as the Election Year Strategy Information Center."  943 F.2d at 985-86.  Similarly, in *Quiñon v. FBI*, 86 F.3d 1222 (D.C. Cir. 1996), the D.C. Circuit found that the FBI had failed to satisfy Exemption 7's threshold where the agency merely stated that the records were compiled pursuant to an obstruction of justice investigation, but "fail[ed] to supply facts that would justify [such an] investigation."  *Id.* at 1229.

Under binding precedent and the law of this case, invoking a "generalized investigatory power is not enough, and the government must cite the specific law it is enforcing and the specific criminal activity suspected."  Order at 10; *Richardson v. United States*, 841 F.2d 993, 996 (9th Cir. 1988) ("Under the 'law of the case' doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case.").  Despite this Court's instruction, the FBI's revised declaration still invokes the agency's "general investigative authority" and still fails to cite specific laws or identify specific suspected criminal activity.  Third Hardy Decl. ¶ 12.

Mr. Hardy merely states that the records were "compiled as a result of assistance the FBI rendered to various state and local law enforcement agencies which were investigating potential criminal activity by protestors involved with the 'Occupy' movement."  *Id.*  But the FBI has failed to cite *any* statute that Occupy protesters are alleged to have violated.  *Cf. Wiener*, 943 F.2d at 986 (citing Civil Obedience Act and Anti-Riot Act insufficient to establish law

enforcement purpose).  And it has also "fail[ed] to supply facts that would justify" any such amorphous criminal investigation.  *Quiñon*, 86 F.3d at 1229.  Merely referencing "potential criminal activity" (Third Hardy Decl. ¶ 12) does "little to inform [Plaintiffs] of the claimed law enforcement purpose underlying the investigation of [Occupy]."  *Wiener*, 943 F.2d at 986.[19]

Mr. Hardy goes on to state:  "As pertinent here, the FBI's assistance *would* also relate to the investigation of federal crimes *such as* domestic terrorism (18 U.S.C. § 2331) and advocating overthrow of government (18 U.S.C. § 2385)."  Third Hardy Decl. ¶ 12 (emphasis added).  But critically, he never states that the FBI's assistance in this case *did* relate to investigation of federal crimes.  He merely hypothesizes a list of potential federal crimes ("such as") to which they "would" relate.  He also "fail[s] to supply facts that would justify an … investigation" of the Occupy movement for engaging in domestic terrorism and advocating overthrow of the government.  *Quiñon*, 86 F.3d at 1229.  As with its prior declarations, "[t]he FBI refers only vaguely to 'crimes' and 'federal laws,' but does not cite the specific laws that it was enforcing."  Order at 10.  For the same reason this Court previously found "the FBI's declaration … insufficient to establish a nexus," it should do so here.  *Id.*

The revised declaration contains echoes of the concerns identified by the Inspector General in its 2010 report reviewing the FBI's investigation of domestic advocacy groups.  The FBI suggests that the Occupy movement was being investigated for domestic terrorism, but it never supplies any factual basis for this suggestion.  Third Hardy Decl. ¶ 12.  Designating Occupy as a terrorist group would be consistent with the FBI's "practice" of routinely classifying investigations of domestic advocacy groups as "domestic terrorism cases" by relying "upon potential crimes that may not commonly be considered as 'terrorism' (such as trespassing or vandalism) and that could alternatively have been classified differently."  IG Report at 188.

If the FBI had actually had a legitimate law enforcement purpose at the time these

---

[19] Specifying the underlying criminal laws supposedly violated is especially important here because the FBI does not have authority to enforce state law.  *See infra* note 20.

records were compiled, there should have been contemporaneous documentation of the basis for its conduct (*see supra* at Part II-E-2 & note 4 (describing FBI documentation requirements to open investigations)), and it should not take three declarations and two rounds of summary judgment for the FBI to identify the specific federal statutes it was investigating and the factual predicate for that investigation. *See Quiñon*, 85 F.3d at 1228 ("asserted law enforcement duty cannot be pretextual"); *cf. also* IG Report at 187 ("FBI agents and supervisors sometimes provided the OIG with speculative, after-the-fact rationalizations for their prior decisions to open investigations that we did not find persuasive").[20]

   ***Collection of counter-terrorism information.***  Also unavailing is the FBI's assertion that it compiled these records pursuant to its broad authority to collect counter-terrorism information.

   In *Rosenfeld*, the Ninth Circuit affirmed the district court's conclusion that the FBI lacked a legitimate law enforcement objective where the documents indicated that the FBI was simply engaged in "generalized monitoring and information-gathering" of former University of California President Clark Kerr. *Rosenfeld*, 57 F.3d at 809 (internal quotation marks, citation omitted); *see also Powell v. United States Dep't of Justice*, 584 F. Supp. 1508, 1522 (N.D. Cal. 1984) (where documents pertained to group's effort to publicize constitutional questions

---

[20] The FBI previously argued that the rational nexus can be satisfied even if the FBI compiles records to enforce a state, rather than federal, law. *See* DOJ's Reply (ECF No. 26) at 10-12. Plaintiffs disagree:  The "rational nexus" must be with enforcement of a *federal* law. *See Rosenfeld*, 57 F.3d at 808; *Church of Scientology of Cal. v. U.S. Dep't of Army*, 611 F.2d 738, 748 (9th Cir. 1979). (In light of its history of overreaching, the FBI does not have authority to investigate state crimes, and it may only provide investigative assistance to state and local agencies under very specific circumstances. *See* 2 U.S. Op. O.L.C. at 47; *supra* at Part II-E-2. When acting outside its authority to enforce federal law, it exceeds its mandate and is thus not engaged in a legitimate law enforcement purpose. *See* Pltfs' Opening Brf. (ECF No. 23) at 17-18; Pltfs' Reply (ECF No. 29) at 12-14.)  This legal dispute was relevant to the validity of the FBI's previous assertion that its law enforcement objective was "to provide services and support … to state and local law enforcement agencies."  First Hardy Decl. ¶ 52.  Because the FBI no longer asserts this as its objective (*see* Third Hardy Decl. ¶ 11), and Mr. Hardy apparently acknowledges that the FBI may only provide investigative assistance to state and local authorities under clearly delineated circumstances, such as "the investigation of matters that may involve federal crimes" (*id*. ¶ 12), the issue appears to be moot.

regarding a criminal prosecution, court failed "to see any rational nexus between this sort of general surveillance and information-gathering and the enforcement of a federal law").

The FBI contends that the records at issue here were compiled "as part of the FBI's core counter terrorism function" and that in the exercise of that function, it has wide-ranging authority to collect and share "suspicious activity reports" with other law enforcement agencies.  Third Hardy Decl. ¶¶ 13-14.  As discussed above, however, the Functional Standards governing suspicious activity reporting define all manner of *non-criminal* activity as having a "potential terrorism nexus."  *See* Functional Standards at 29-30.  They include:  "[e]liciting information," "[p]hotography," and "observation through binoculars" of "facilities, buildings, or infrastructure." *Id.*  In other words, any competent investigative photojournalist is likely to engage in activity that the federal government believes to have a potential terrorism nexus and should therefore be entered into a federal counter-terrorism database.  Indeed, individuals have been swept up into SAR databases for photographing post offices, bridges, dams, and courthouses.  *See* Third Lye Decl. at Exhs. 9-10.  Others have been reported for engaging in such "suspicious" activity as buying pallets of water or being Middle Eastern and "unfriendly."  *See id.* at Exh. 9.

This evidence shows that the federal government's overly broad standards for suspicious activity reporting have become an invitation to "generalized monitoring and information-gathering" about entirely lawful activity.  *Rosenfeld*, 57 F.3d at 809.  The Court need not address whether the FBI may engage in this kind of widespread collection and maintenance of intelligence about the lawful conduct of innocent Americans.  *Cf.* 28 CFR § 23.20(a) (allowing "collect[ion] and maint[enance] [of] criminal intelligence information concerning an individual only if there is reasonable suspicion that the individual is involved in criminal conduct or activity and the information is relevant to that criminal conduct or activity").  But it should hold that the FBI cannot rely on Exemption 7 whenever it casts a net so wide that it traps entirely innocent, and in some cases constitutionally protected, activity.  *See Rose*, 425 U.S. at 361 (FOIA's exemptions "must be narrowly construed").  Allowing the FBI to monitor Occupy or other political movements in the name of collecting counter-terrorism information would cast a cloud

of secrecy where the need for sunshine is greatest.[21]

## C.   The FBI Has Not Met Its Burden Of Establishing The Remaining Elements Of The Law Enforcement Exemption

Because the FBI has not satisfied the "rational nexus" for Exemption 7, the Court should order disclosure of all information withheld on this basis.  Disclosure is required for the independent reason that the FBI has not met its burden as to each of the subsidiary law enforcement exemptions.

### 1.   Exemption 7(A) For Pending Law Enforcement Proceedings

Exemption 7(A) exempts materials disclosure of which would "interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  The Court previously found the FBI's declarations too conclusory.  Order at 11.  The FBI has now withdrawn a number of 7(A) assertions and raises this issue only as to Bates 38-40.  Third Hardy Decl. ¶ 17.  The revised declaration states that "some of the information" would "reveal the target, focus, and scope of" a pending investigation, and goes on to state that the agency "concluded that no information could be segregated without negatively impacting the on-going proceedings."  *Id.* ¶¶ 18-19.

In the FBI's own account, only "some of the information" in this document is exempt. Agencies have a duty to disclose "[a]ny reasonably segregable portion of" records that are not exempt.  5 U.S.C. § 552(b).  The FBI's declaration "fall[s] short of the specificity required … to properly determine whether the non-exempt information is, in fact, not reasonably segregable." *Branch v. FBI*, 658 F. Supp. 204, 210 (D.D.C. 1987); *see also, e.g.*, *Lawyers' Comm. for Civil Rights of San Francisco Bay Area v. Dep't of Treasury*, 2008 WL 4482855, at *14 (N.D. Cal. Sept. 30, 2008) (statement that agency "determined that there was no reasonably segregable information that could be released" inadequate to justify withholding entire documents because

---

[21] Even if the two objectives asserted by the FBI established the requisite rational nexus, which they do not, the FBI has failed to "explain why *each* withheld document or set of closely similar documents relate to a particular law enforcement purpose."  *Campbell*, 164 F.3d at 33 (emphasis added).  The FBI tosses out two broad grants of purported authority, but never clarifies which document was collected for what purpose.

1  agency required to "*explain*[] why segregation is not possible in this case").

2          2.          **Exemption 6 and 7(C) For Personal Privacy**

3          FOIA exempts from disclosure information that "could reasonably be expected to

4  constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).  The Court

5  previously rejected the FBI's assertion of this exemption as to three disputed categories:  third

6  parties who provided information to the FBI, third parties merely mentioned in the records, and

7  local law enforcement officers.  Order at 12-13.[22]  The Court held that the FBI's assertions of

8  privacy harms were too conclusory.  *Id.* at 13.  The FBI's revised declaration does nothing to

9  cure these defects.  The public interest in disclosure of each of these categories outweighs

10 privacy interests, and does not justify the withholding of entire documents. [23]

11          ***Third parties who provided information to FBI***.  Disclosure of information pertaining to

12 third parties who provided information to the FBI serves "FOIA's purpose to disclose publicly

13 records that document whether the FBI abused its law enforcement mandate by overzealously

14 investigating a political protest movement…."  *Rosenfeld*, 57 F.3d at 811-12 (rejecting FBI's

15 Exemption 7(C) for FBI documents pertaining to Free Speech movement).  The identity of FBI

16 interviewees would shed light on the scope and propriety of the FBI's investigation of Occupy

17 and further the public interest in learning "whether and to what extent the FBI investigated

18 individuals for participating in political protests, not federal criminal activity."  *See id.* at 812.

19          As in its prior declaration, the FBI's revised declaration makes the conclusory assertion

20 that individuals face "the potential" for harassment or retaliation if their identities are disclosed.

21 *Compare* Third Hardy Decl. ¶ 20(a), *with* First Hardy Decl. ¶ 61.[24]  The FBI then asserts that

22

23 _____

24 [22] The FBI asserted this exemption as to an additional category (FBI agents and support personnel), which Plaintiffs do not contest.  *See id.* at 12.

25 [23] Records can also be withheld, even if they were not compiled for a law enforcement purpose, if they satisfy the heightened "*clearly* unwarranted invasion of personal privacy" standard.  5

26 U.S.C. § 552(b)(6) (emphasis added).  Because the FBI has not met its burden under Exemption 7(C), it necessarily fails to satisfy the heightened showing under Exemption 6.

27 [24] The FBI has withdrawn its (unsupported) assertion that individuals would face threats of "legal

28 consequences, economic reprisal, or possible physical harm."  First Hardy Decl. ¶ 61.

"[t]here is no basis on the face of the records at issue to determine that these names and/or identifying information bear in any way upon the FBI's performance of its statutory duties, or contribute significantly to the public understanding of its operations or activities."  Third Hardy Decl. ¶ 20(a).  But as the Ninth Circuit explained in the context of FBI surveillance of the Free Speech Movement, "[d]isclosing the names of the investigation subjects would make it possible to compare the FBI's investigations to a roster of the [movement's] leadership" and thus "promotes the public interest of this FOIA request."  *Rosenfeld*, 57 F.3d at 812.  The FBI's speculative assertions of harm do not outweigh the public interest in learning whether the FBI systematically interviewed leaders and activists in the Occupy movement.

  ***Third parties merely mentioned***.  For the reason discussed above with respect to third party interviewees, information about third parties mentioned in FBI files should also be disclosed.  Even if the FBI did not interview these individuals, there is a strong public interest in learning whether the FBI systematically sought to acquire information about Occupy leaders and activists.  Moreover, the FBI emphasizes that "[i]nformation about these third parties appear in these records by mere happenstance."  Third Hardy Decl. ¶ 20(b).  That being so, there is no basis to believe that they would face "unnecessary criticism" or any of the other speculative harms asserted by the FBI.  *Id.*

  ***Local law enforcement***.  In *Lissner v. United States Customs Serv.*, 241 F.3d 1220 (9th Cir. 2001), the Ninth Circuit rejected the applicability of this exemption to local law enforcements officers where, as here, the agency "has made absolutely no showing" that disclosure would subject officers "to danger, harassment, or embarrassment."  *Id.* at 1224.

  ***Extensive publicity.***  In addition, for each of these categories, and as the Court previously observed, "the identities of many Occupy protesters and local police officers were covered extensively by the news media.  These persons' privacy interests will be less than other individuals who have not become public figures.  But the FBI's general statements and conclusions do not allow the Court to balance these interests."  Order at 13.

  ***Segregation.***  In any event, any privacy interests can be adequately protected by

redacting names; documents need not be withheld in full.  *See Gordon*, 390 F. Supp. 2d at 901.

### 3.    Exemption 7(D) For Confidential Sources

The Court previously held that the FBI had not satisfied Exemption 7(D) for confidential sources because the agency "failed to provide any probative evidence that there were express or implied assurances of confidentiality."  Order at 14.  The revised declaration is still insufficient.

In *United States Dep't of Justice v. Landano*, 508 U.S. 165 (1993), the Supreme Court rejected "a presumption that a source is confidential within the meaning of Exemption 7(D) whenever the source provides information to the FBI."  *Id.* at 181.  The exemption applies only if "the particular source spoke with an understanding that the communication would remain confidential."  *Id.* at 172 (emphasis omitted).

Mr. Hardy states that some sources were given an express assurance of confidentiality.  Third Hardy Decl. ¶ 21.  A "bald assertion that express assurances were given … is insufficient." *Billington v. United States Dep't of Justice*, 233 F.3d 581, 584 (D.C. Cir. 2000).  Rather, "the FBI must present probative evidence that the source did in fact receive an express grant of confidentiality," such as "notations on the face of a withheld document," "personal knowledge," "or contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources."  *Campbell*, 164 F.3d at 34 (internal quotation marks, citation omitted).  Mr. Hardy merely states that "the confidential sources … are established sources for which the FBI has assigned specific source symbol numbers.… Only established sources of the FBI receive source symbol numbers."  Third Hardy Decl. ¶ 21.  The fact that the source was "established" sheds no light on whether the source was expressly promised confidentiality.  A new and untested source could have been given an express promise.  A seasoned source may never have received one.  After two prior opportunities to provide the Court with probative evidence of an express assurance of confidentiality, First Hardy Decl. ¶¶ 68-69; Second Hardy Decl. ¶ 17, the FBI has again once failed to meet its burden.

The FBI fares no better with sources supposedly offered an implied assurance of confidentiality.  The revised declaration states that the assurance can be implied because "these

sources are individuals who are members of organized violent groups," and "it was appropriate for the FBI to infer an expectation of confidentiality given the seriousness of the potential crime, the position of the sources, and the information they provided."  Third Hardy Decl. ¶ 22.  But the FBI fails to support the conclusory assertion that the group here is "organized" and "violent" and nowhere identifies the nature of the supposedly serious potential crime or the position held by the source.  *See Landano*, 508 U.S. at 179 (agency must describe source-specific circumstances that would support inference of confidentiality, such as "the character of the crime at issue" or "the source's relation to the crime").  This is even less information than in the declaration found inadequate in *Quiñon.  See* 86 F.3d at 1232 (declaration stated that investigation "related to the 'notoriously violent' crime of drug trafficking").

Moreover, as with its prior declarations, the FBI "fails to even make the barest assurances that the identifying information of the confidential sources cannot be segregated."  Order at 14. Again, the FBI has entirely failed to cure the insufficiencies previously identified by the Court.

### 4.    Exemption 7(E) For Investigative Techniques

Exemption 7(E) authorizes withholding of investigative techniques where disclosure would "risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  The FBI previously asserted, and this Court rejected, this exemption for (1) investigative techniques and procedures, and (2) identity of FBI units.  Order at 15.  The FBI reasserts this exemption for these two categories and now adds two additional categories:  "Database and Database information" and "Collection and/or Analysis of Information."  Third Hardy Decl. ¶ 23(a)-(e).

***Techniques used to conduct national security investigations***.  As this Court has held, "[i]n order to justify non-disclosure, the [agency] must provide non-conclusory reasons why disclosure of each category of withheld documents would risk circumvention of the law." *Feshbach v. SEC*, 5 F. Supp. 2d 774, 787 (N.D. Cal. 1997) (granting summary judgment for Plaintiffs on (b)(7)(E)).  The FBI's revised declaration contains only boilerplate that recapitulates the conclusory assertions in the two prior declarations that this Court has already rejected. *Compare* Third Hardy Decl. ¶ 23(c), *with* First Hardy Decl. ¶ 71; Second Hardy Decl ¶ 18.

*FBI units*.  Once again, the FBI asserts 7(E) for the identity of the FBI units.  Third Hardy Decl. ¶ 23(e).  This Court has already rejected this argument in this case and another.  *See* Order at 15-16; *Elec. Frontier Found. v. Dep't of Defense*, 2012 WL 4364532, at *7 (N.D. Cal. Sept. 24, 2012).  The FBI offers no new factual information to justify a different result.  *See Richardson*, 841 F.2d at 996 (court precluded from reexamining previously decided issue under law of the case doctrine).[25]

*Database and Collection/Analysis Information*.  The revised FBI declaration now offers a new justification for withholding information pursuant to Exemption 7(E).  It contends that these documents implicate the "suspicious activities" tracked in federal counter-terrorism databases, and that disclosure of the information would "reveal the characteristics and data that are collected and tracked," as well as "the manner in which the FBI applies and analyzes this information."  Third Hardy Decl. ¶ 23(a)-(b).  The criteria used by the federal government for classifying activities as "suspicious" and thus subject to tracking in federal databases are publicly available and set forth in the ISE "Functional Standards"; they include behaviors such as "[c]yber [a]ttack[s]" and "[p]hotography."  *See* Functional Standards at 29.   The process for collecting, vetting, and disseminating Suspicious Activity Reports is also public.  In brief, "private citizen[s], … private sector partner[s], … or a law enforcement officer[s]" may report suspicious activities that they observe to a local law enforcement agency.  GAO Report at 7.  Next, the information is then passed along to either a "fusion center," which are "focal points within states and localities for the receipt [and] analysis…of … threat-related information," "or the FBI, where trained analysts review the SAR and compare it with criteria outlined in the Functional Standard to determine if it has a potential nexus to terrorism."  *Id.* at 5, 7.  SARs that are determined to satisfy the Functional Standard issued by the ISE are then "electronically submitted" to the FBI's eGuardian database or another database.  *Id.* at 7.

---

[25] The FBI also seeks to withhold "file numbers" pursuant to Exemption 7(E).  Its argument rests on the same mosaic theory used to justify withholding of FBI units, and rejected by this Court. *Compare* Third Hardy Decl. ¶ 23(d), *with id.* ¶ 23(e).

1    "Exemption 7(E) only exempts investigative techniques not generally known to the

2    public." *Rosenfeld*, 57 F.3d at 815.  Because the "characteristics" of activity "collected and

3    tracked" is already well known to the public, as is information about the manner in which the

4    information is collected and analyzed (Third Hardy Decl. ¶ 23(a)-(b)), this exemption does not

5    apply.  Nor has the FBI explained why any exempt information is not reasonably segregable.

6    **D.     The FBI's Submission Of An *In Camera* Declaration Deprives Plaintiffs Of
          A Meaningful Opportunity To Contest The National Security Exemption**

7

8    The Court previously held that the FBI had failed to meet its burden of withholding

9    information pursuant to Exemption 1, for national security, because the agency's declarations

10   failed to explain how revealing intelligence source methods or a particular source will harm

11   national security.  *See* Order at 9.  The agency has now submitted an *ex parte* declaration *in*

12   *camera*.  *See* Notice of Lodging.

13   In *Wiener*, a case involving an Exemption 1 assertion by the FBI, the Ninth Circuit

14   explained that "[i]n camera review of the withheld documents by the court is not an acceptable

15   substitute for an adequate *Vaughn* index" because it "does not permit effective advocacy."  943

16   F.2d at 979.  Here, the FBI has submitted, unsolicited, for *in camera* review a declaration

17   describing the documents, not even the documents themselves.  Other agencies invoking

18   Exemption 1 have submitted public declarations.  *See, e.g.*, *Bay Area Lawyers Alliance v. Dep't*

19   *of State*, 818 F. Supp. 1291, 1297 & n.1 (N.D. Cal. 1992) (declaration found adequate where

20   agency described document as "examin[ing] the technical and military needs for the United

21   States to conduct high yield (greater than 150 kilotons) underground nuclear tests").

22   Plaintiffs are unable to determine whether it was truly necessary for the FBI to submit an

23   *in camera* declaration here.  In light of the *in camera* submission, Plaintiffs are also unable to

24   assess or contest the validity of the FBI's continued assertion of Exemption 1.  *See Wiener*, 943

25   F.2d at 977 (plaintiff must have meaningful opportunity to contest exemptions).

26   To the extent *in camera* review is appropriate at all, Plaintiffs respectfully submit that

27   the FBI should submit the document itself along with a declaration for this Court's review.  *Cf.*

28

Fed. R. Evid. 1002 (original writing required to prove contents).  Such was the approach utilized by another court of this District in *Rosenfeld v. United States Dep't of Justice*, 761 F. Supp. 1440, 1442-43 (N.D. Cal. 1991).[26]  In that case, the Ninth Circuit affirmed the district court's rejection of the FBI's Exemption 1 assertion as to three documents.  *See Rosenfeld*, 57 F.3d at 807 (affirming district court's conclusion that documents 22, 51, and 244 should be released in full or part).  The district court had ordered these documents released in full or part for a variety of reasons:  They "contain information that is likely to have been public knowledge"; "the number of sources and generalized nature of the information are not likely to result in disclosure of sources," 761 F. Supp. at 1451; "[t]he 'source' and 'intelligence capability' demonstrated here are self-evident," *id.* at 1456; and one of the redactions does "not disclose to the court any information regarding an intelligence method."  *Id.* at 1461.  The district court would not have been able to arrive at these factual determinations without reviewing the documents themselves.  To the extent the document at issue here presents any similar issues, Plaintiffs respectfully submit that the Court should order it disclosed.[27]

## IV.  CONCLUSION

For the foregoing reasons, the Court should grant summary judgment for Plaintiffs.  In support of its prior motion for summary judgment, the FBI already submitted two declarations. It has now submitted a third declaration that has still failed to cure the deficiencies previously identified by the Court.  It will undoubtedly submit a fourth in opposition.  Plaintiffs

---

[26] That case involved *in camera* review by a magistrate of over 450 documents.  *See id.* at 1442-43.  Here, by contrast, the FBI has asserted Exemption 1 only as to a single two-page document. *See* First Hardy Decl. at Exh. H at Bates 22-23.  There would thus be considerably less burden on the Court than in *Rosenfeld* and potentially less burden in reviewing the document itself than the *in camera* declaration purporting to describe it.

[27] To the extent the Court declines to review the document *in camera*, Plaintiffs urge the Court not to rule in the FBI's favor on Exemption 1 unless at a minimum the agency provides a particularized explanation of how disclosure of the specific information in this document would injure national security.  *See Wiener*, 943 F.2d at 981 ("The index does not describe any particular withheld document, identify the kind of information found in that document that would expose the confidential sources, or describe the injury to national security that would follow from the disclosure of the confidential source of the particular document.").

respectfully submit that the Court should grant summary judgment for Plaintiffs and order the information disclosed, rather than allowing the agency to submit yet another declaration.  The FBI should not get a fifth bite at the apple.

Dated: October 25, 2013                    Respectfully submitted,

                                           By:  _____/s/_____
                                                          Linda Lye

                                           Michael T. Risher
                                           Linda Lye
                                           AMERICAN CIVIL LIBERTIES UNION
                                           FOUNDATION OF NORTHERN CALIFORNIA

                                           Attorneys for Plaintiffs